**WHEELING STAMPING COMPANY, Appellant,**

v.

**BIRDSBORO STEEL FOUNDRY & MACHINE COMPANY.**

No. 12082.

United States Court of Appeals Third Circuit.

Argued Feb. 7, 1957.

Decided June 26, 1957.

---

1. More than a quarter of an ounce, but less than half an ounce.

Loyal H. Gregg, Pittsburgh, Pa., (Gregg & Price, Pittsburgh, Pa., William H. Parmelee, Christy, Parmelee & Strickland, Pittsburgh, Pa., on the brief), for appellant.

Sidney L. Wickenhaver, Philadelphia, Pa. (Ralph W. Brenner, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, STALEY, and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This controversy between a buyer, Wheeling Stamping Co., and a seller, Birdsboro Steel Foundry & Machine Co., arose out of the buyer's attempt to rescind the sale of a large hydraulic press specially designed and constructed for the commercial molding of plastic caps in large quantities. The buyer sued to get back the purchase price and the court, sitting without a jury, found that the seller had properly performed its contract and was entitled to the agreed price. The buyer now appeals.

The contract was made and was to be performed in Pennsylvania. Federal jurisdiction depends upon diversity of citizenship. Thus, Pennsylvania law controls the interpretation of the contract and provides the applicable principles concerning rescission.

The seller is a designer and manufacturer of special machinery. The buyer is a manufacturer of tubes and plastic caps such as are used in packag-

ing tooth paste, shaving cream and drug products.

In 1944, when this contract was negotiated, the buyer's manufactures included plastic caps of two different basic shapes. In one type the closed end or head of the cap was no wider than the sides. The second shape, called a "mushroom" cap, featured a head of substantially greater diameter than the side or wall portion. Wheeling already owned and successfully used machines for the automatic molding of straight sided caps, but in the manufacture of mushroom caps part of the operation had to be manual. In a search for an advantageous automatic method of producing mushroom caps Wheeling acquired exclusive rights to a patent, called the Rahm patent, which was thought to embody a satisfactory method of manufacturing a large quantity of mushroom caps automatically.

Wheeling then negotiated to have Birdsboro build for it a large hydraulic press embodying the Rahm patent. It was recognized that this would be the first machine of its type. Because of the costliness of designing and building such a pioneer machine Birdsboro was willing to undertake this work only if it should be given a license to manufacture and sell to its own accounts other machines embodying the Rahm patent.

Contracts covering these agreements were duly executed. Birdsboro undertook to build and sell and Wheeling to buy a "112 ton automatic molding press to produce tube caps automatically and to be based on the U. S. patent No. 1,944,571 in the name of Walter E. Rahm." The seller also undertook "to produce a commercially operable machine." The agreed price was approximately $33,000 and the seller was given a far-reaching license to manufacture and market other machines embodying the Rahm patent.

In the light of the subsequent failure of the machine to perform as both parties had hoped and anticipated, it becomes important to determine at the outset the meaning and significance of the promise of the seller to produce a "commercially operable" machine. We agree with the district court that this promise was a basic term of the sale although it was actually incorporated, not in the sale contract, but in the companion document in which the buyer licensed the seller to produce Rahm machines to its own account. We are entirely satisfied that the district court was correct in reasoning that this promise was a basic part of the consideration for the buyer's promise to buy and pay for the machine.

We think, however, that the district court was mistaken in its view of what would constitute a "commercially operable" machine under this contract. Emphasizing the fact that this was the first machine of its type, the district court concluded that it would be "unreasonable to interpret a promise to build a commercially operable machine as an undertaking by the manufacturer to produce a machine which would operate successfully in the business sense. * * *" To us this seems to be a rejection of the normal meaning of these words in circumstances which suggest that the parties intended their normal meaning. Although this was the first machine of its kind, this type of designing and building of special and unusual machinery was Birdsboro's business. It properly held itself out as being expert and experienced in such difficult undertakings. It is even more significant that, before contracting to build the machine, Birdsboro had its expert observe operations in the Wheeling plant and conduct discussions with the Wheeling staff. It was made clear that both straight sided and mushroom caps were already in quantity production and that the whole purpose of the proposed contract was to achieve greater speed and greater economy in the mass production of plastic caps. Preliminary studies, designs and tests—as mentioned in the contract itself—seem to have convinced both parties that Birdsboro could build a Rahm type machine which would fulfill these expectations of business advantage.

Indeed, this confidence was the obvious basis of Birdsboro's insistence before undertaking the job that it be licensed to produce and sell other similar machines on its own account.

The parties contracted with reference to the circumstances and requirements of a particular enterprise as it was conducted and observed in 1944. In that view a machine could not have been "commercially operable" unless its performance was good enough to approximate, if not surpass Birdsboro's old machines in the commercial mass production of plastic caps. If the phrase under construction does not require that much, then the adjective "commercial" has no significance. We think Birdsboro performed its contract only if it produced a machine which would work satisfactorily in the sense of achieving such a production record in comparison with the machines already in use by Wheeling as to make the operation of the new machine economically feasible. Indeed, under the circumstances of this case the express promise to produce a "commercially operable" machine did not differ greatly from the warranty of fitness for intended purpose which is often implied but was ruled out by the court in this case because of a comprehensive disclaimer of implied warranties which appeared in the contract.

 By this standard we think it is clear that Birdsboro failed to produce a "commercially operable" machine. The venture proved ill-starred almost from the beginning. The basic contracts were executed in December 1944 and January 1945. Various conditions in the immediate post war period delayed the construction. Engineering problems and trade developments also caused delay and led to mutually agreed changes in the contract. For various reasons it was not until the summer of 1947 that the builder's work reached the stage of first tests of the new hydraulic press in Birdsboro's own plant. Testing and alterations continued for another two years. Late in 1949 the parties found themselves in disagreement whether the machine worked well enough for the buyer to accept it and to try a production run in its plant. However, this impasse was resolved by a proposal of the buyer, accepted by the seller, that the machine be modified so that it would achieve automatic production of straight sided caps. This, it was thought, would both avoid difficulties of design and operation inherent in the production of the mushroom type cap and also operate to the buyer's advantage, for the commercial trend to the mushroom style of cap which influenced the 1944 contract had been reversed during the five years which had been required to build this machine. Finally, in 1950 the seller insisted that the machine, incorporating the agreed changes, was in such condition that the buyer should accept delivery and pay for it, with the seller thereafter cooperating in working out whatever problems should arise during testing and a production run after installation in the buyer's plant.

During the spring of 1951 the machine was delivered, paid for and installed at the buyer's plant. During the following months of testing a considerable amount of additional work was done by technicians of both parties in an effort to improve the operation. Thereafter, in the fall of 1951, although it was mutually recognized that several defects and shortcomings persisted, it was agreed to undertake a production run.

Records were kept of the production run over a period of nearly three months from October 15, 1951 to January 4, 1952. It will be remembered that the contract itself described the machine as "automatic" and that from the beginning the very subject of negotiation was the automatic production of caps on a commercial basis. It proved impossible to keep the machine in continuous operation for any substantial period. A variety of operational defects resulted in frequent stops and interruptions. Only 550 hours of operation were achieved from October 15th to January 4th, although the attempt was made to operate on a 24 hour a day basis. Moreover,

unlike the automatic machines already installed in the Wheeling plant, this machine required an operator constantly in attendance. In this connection it will be remembered that the machine was now producing straight sided caps, a fully automatic operation on machines in use at the time of the original negotiations.

Finally, the percentage of rejects and imperfect caps was so high that the production could not possibly have been considered competitive with the existing machines and methods. True, a quantity of salable caps was produced during this 550 hour production. In this sense the machine was "operable"; but certainly, under the standard already indicated, it was not "commercially operable".

In January 1952, after the conclusion of the unsatisfactory production run, the buyer notified the seller that it regarded the machine as commercially inoperable and insisted upon rescinding the contract. The court below made no specific findings as to what happened between this notice of rescission in January 1952 and the filing of the present suit in July 1953. There was testimony that some discussion occurred between the parties concerning further remedial efforts on the one hand and the possible disposition of the machine on the other. However, neither in its pleadings nor in proof did the seller establish or even assert that it had called upon the buyer, after the attempted rescission, to permit it to remedy the defects which caused the production run to fail.

██ It is in the light of this course of events following the announcement of rescission that an alternative basis of decision in the court below must be considered. The district court reasoned that, even if the machine as installed was not yet "commercially operable", the buyer did not afford the seller a reasonable opportunity to remedy those defects which caused serious trouble during the production run. However, it will be remembered that both parties had been attempting to make the machine work satisfactorily from its first test in 1947 until the completion of the production run in 1952. Moreover, the seller had insisted that the machine as delivered in 1951 was in a "commercially operable" condition and that it was ready for a production run. In these circumstances, we think it was entirely reasonable for the buyer to give notice of rescission when months of additional work in its plant were followed by a notably unsatisfactory production run. Cf. Farrell v. Brandtjen & Kluge, Inc., 1954, 176 Pa.Super. 412, 107 A.2d 695; Knapp v. Willys-Ardmore, Inc., 1953, 174 Pa. Super. 90, 100 A.2d 105. Moreover, if the seller believed it was entitled to more time to make changes which would satisfy its contractual undertaking, it was at least obligated to respond to the notice of rescission with a request that such an opportunity be granted. Whether under the circumstances it would have been the duty of the buyer to accede to such a request we need not decide. Cf. Cleaver v. Bullock, 1886, 111 Pa. 441, 4 A. 852. For, on the record, that request was never made.

The judgment will be reversed and the cause remanded for the entry of appropriate judgment for the plaintiff.