**DAY & ZIMMERMANN, INC.**

v.

**BLOCKED IRON CORPORATION OF AMERICA.**

Civ. A. No. 23161.

United States District Court
E. D. Pennsylvania.

Sept. 22, 1960.

See also 200 F.Supp. 132.

**118**

Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

H. Francis DeLone, Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The plaintiff is a corporation engaged in the designing, engineering and construction of industrial plants of various kinds. The defendant in 1955 was the owner of a new and recently patented process, described as the "recrystallized limestone" process, for making blocked iron. Blocked iron consists of iron ore fines molded into cylindrical blocks for use in open hearth steel furnaces and hardened to prevent their breaking up when handled, transported and stockpiled.

On December 12, 1955, the plaintiff and the defendant, who will be called "D&Z" and "BICOA" respectively, in this opinion, entered into a contract the subject of which was a plant for the production of blocked iron to be erected at Philadelphia.

Work was begun in May, 1956, and continued until the latter part of November of that year at which time the plant, having been fully constructed with all equipment installed, was put into operation. Owing to unsatisfactory performance of some of the equipment, notably a drying oven, production was disappointing, and, from the attempted start-up until August of 1957, D&Z, at BICOA's request, continued on the job, most of its work being in connection with remedying deficiencies in the equipment and making changes and improvements in details of operation.

The contract provided for payments to be made to D&Z on monthly invoices covering expenditures made and costs incurred by it, as well as a proportionate part of its compensation.

Beginning in December, 1956, BICOA ceased making any payments to D&Z although the latter continued to submit regular monthly invoices. On August 1, 1957, D&Z, having notified BICOA that the step it was taking was due to non-payment of its charges, withdrew its men from the job. After that time some further improvements and changes, amounting to about $20,000, were made by other contractors employed by BICOA.

The plant was operated intermittently during the first half of 1957. After July 4 it began to produce in substantial quantities. It has been operating in commercial production since December, 1957, and, for at least the past two years, on a very profitable basis.

This action was begun by D&Z's suing for a balance claimed, now fixed by it at $193,859.01. BICOA denied liability on the ground of breach of contract by D&Z and counterclaimed for damages resulting from D&Z's alleged default. The case was tried to the Court without a jury. By an order under F.R.Civ.P. Rule 42(b), 28 U.S.C.A., the Court directed that the trial of the issue of BICOA's damages, if such trial should be justified, be deferred until a separate trial and final determination by the trial court of all other issues had been had.

The record is voluminous—nearly 3,000 pages of testimony and several thousand more of depositions—but, at the risk of over-simplification, I think the issues can be stated as follows: What were D&Z's obligations under the contract? Did D&Z fail to perform its obligations? Was BICOA justified in withholding payments from D&Z and was D&Z within its rights in quitting the job on that account?

Taking up the first of these issues.

D&Z's contention is that its sole obligation was to provide engineering and other services in connection with the design and construction of the plant, that the contract was, and remained without change, a cost plus contract with the usual provisions for reimbursing D&Z for all costs and expenditures which it might incur and for payment of a fixed fee (in this case originally $37,500) but with no promise that the work would be completed by any fixed time and no guarantee of results or of maximum cost and that D&Z was not obligated to design the equipment or to check the design of the vendors.

BICOA's position is that D&Z agreed to construct the plant, with full responsibility for everything in it, and, in effect, guaranteed that as soon as completed it would be capable of producing 360,000 [1] long tons of blocked iron per year, that, whatever the original term as to cost may have been, that feature of the contract was converted by a letter written in July of 1956 into a promise by D&Z that the total maximum cost of the plant would not be in excess of $1,165,000 and that, although no stated date for completion was specified in the contract, D&Z was in default for not having had the plant completed and ready for "normal" production by November 30, 1956.

The contract contains six pages of part printed and part typewritten matter and is too lengthy to be set out at this point. A copy is annexed to this opinion.

In construing this contract I am unable to accept in full either party's view of it, although I think that D&Z's comes much closer to its real intendment than BICOA's. When the entire contract is read and all of its terms including the modifications of it considered, it becomes quite clear that, while it obligates D&Z to erect the building and to locate and install in it the various pieces of equipment, as to all other matters it is a contract for services in connection with which D&Z's obligation was to render engineering and other cognate services with reasonable professional skill.

BICOA's argument is largely tied to the words "We hereby propose to design and construct a plant * * * with a rated capacity of 250,000 long tons per year".

Unquestionably D&Z agreed not only to design the building but to erect [2] it and install the equipment. It is equally clear that it did not agree to construct, i. e., manufacture, the equipment nor to design it. An agreement to design and construct a plant does not include the designing of the complicated and special purpose machinery which a plant of this kind would need. Besides, the contract contemplates that the equipment will be purchased from manufacturers ("vendors") and explicitly sets forth D&Z's obligations in respect of it, namely, to recommend its "type and character" and to prepare working drawings and specifications "necessary for obtaining bids".[3]

I cannot agree, as argued by BICOA, that the reference to the proposed plant's "rated capacity" imports a guarantee that the plant, when operated, would actually produce that much, nor that BICOA so understood it. BICOA's argument in support of its interpretation would be more persuasive had the parties used the word "capacity" unmodified. Parties to a contract are not presumed to have inserted meaningless words into it, and, if "rated capacity" means no more or less than "capacity",

1. In March, 1956, the contract was modified by changing the rated capacity from 250,000 long tons per year to 360,000, and on May 1, D&Z gave BICOA an "official estimate" of the cost at $1,038,815.

2. A good deal of the construction work was actually done by subcontractors, with BICOA's approval.

3. This last appears in the typwritten part of the contract and obviously limits the general provision "prepare plans and specifications for such equipment" appearing in the printed part I.2.

as BICOA in substance contends, the parties to this contract would have done just that.

The fact is that it is hardly possible to write a contract for services without some reference to or description of the thing or project in connection with which the services are to be performed and the reference to the size of the plant, its expected or desired production, in this contract is a natural and normal way of identifying and describing the work in connection with which D&Z's services are to be performed.

Even if it be assumed that "rated capacity" was intended to be contractual rather than merely descriptive of the project, the tonnage mentioned was an estimate. The intent of the parties in this respect appears if one reads the end of the sentence in which it is used ("as set forth in letter dated November 11, 1955 addressed to Leonard J. Buck, Inc.") and then turns to the letter referred to and observes that it says "The estimated capacity of this plant properly managed is 255,000 long tons per year * * *."

It is also significant that D&Z agreed to execute the construction work and install the equipment only "to the extent required by you". This left BICOA entirely free to do as much of this part of the work as it wanted to, and it is hard to believe that anyone would think that a contractor would assume full responsibility for the result of work any part of which the owner, if he so chose, could take out of the contractor's hands and do himself or give to another contractor.

BICOA relies heavily on the case of Wheeling Stamping Co. v. Birdsboro Steel Foundry & Machine Co., 3 Cir., 245 F.2d 752, but the situation in that case was quite different from that in the present one. In the Birdsboro case the whole basis of the decision was a fact finding (not seriously challenged) that a manufacturer had promised a certain result, namely, that a machine to be built by it would be "commercially operable". The only question was what "commercially operable" meant. In the present case, the promise is to render services in connection with the construction of a manufacturing plant. There is no promise or guarantee of any result, and the question is, Were the services rendered with reasonable skill?

Another point urged by BICOA is based on a sentence in the contract, "We will prepare complete working drawings and specifications necessary * * * for executing the complete construction of the plant, ready for putting into operation for normal production of blocked iron as above described". Of course, this provision binds D&Z to prepare drawings and specifications for the entire plant, but I do not think that "normal production" means anything more than that the plant, when completed, shall be equipped to go into full scale production of blocked iron without more than the ordinary delays and revisions to be expected in a newly constructed plant. The word "normal" can hardly have any other meaning in view of the fact that the subject matter is a plant using a new process never before employed in large scale continuous operation. BICOA has not proved to my satisfaction that, given the time, D&Z would not have done everything necessary to have had the plant in normal production, as I read the meaning of that expression.

BICOA contends that in addition to the obligations assumed by D&Z under the original contract there was a subsequent agreement that the total maximum cost of the plant would not be in excess of $1,-165,000. Conceding that the figure in the original contract was merely an estimate, BICOA relies on D&Z's letter of July 26, 1956, as a promise by the latter to construct the plant for no more than $1,165,000. The letter, referring to that figure as a "revised estimate", says, "We can assure you that this new total will not be exceeded for the scope of work involved". Attached to the letter was a breakdown listing of specific items together with the estimated cost of each. The list is entitled "Estimate Comparison" and compares the cost of the various items with a previous estimate of May 1,

1956, in the total amount of $1,038,815. The items listed in the two estimates are substantially the same, the principal difference being that the later one shows increased cost of a number of items. It does not purport to estimate the cost of engineering services during the start-up period or the cost of services in connection with any different or additional equipment.[4]

■ Where there is any doubt about the meaning of a contract, it is always relevant to show how the parties themselves understood and interpreted it, and in this case BICOA's conduct strongly suggests that it never thought that it had a fixed maximum price contract until after this controversy arose.

When the differences between the parties became acute in July, 1957, and D&Z left the job because BICOA had paid nothing for the last six months' work, BICOA justified its refusal to pay solely on the ground of what it claimed was the insufficient capacity of the plant, making no mention of the fact that the cost had well exceeded the figure which it now claims was a binding commitment on the part of D&Z (Letter of August 2). Moreover, during this entire period, from December 5 to August 1, in spite of frequent demands for payment, BICOA never let D&Z know that it was not going to pay for the work which D&Z was then doing, although the whole cost of it was over the alleged fixed price. It seems obvious that BICOA understood that the figure given in the letter of July 26, 1956, was an estimate applicable only to the items listed and that its claim that the letter was intended to guarantee that the cost figure mentioned would not be exceeded, no matter how much more work was done or what additional equipment or materials were needed, is an after-thought.

BICOA also contends that the fact that the plant was not ready for successful commercial operation by November 30, 1956, constituted a default on the part of D&Z. However, if any one thing about the contract is clear, it is that it was intended that D&Z should not assume any obligation whatever with respect to the time for the completion of the plant. The only reference in the contract to time is the following: "It is recognized that the period of time over which this contract is to be performed is uncertain as of this date. However, we will use every reasonable effort to have the work hereunder completed at the time you desire." Not only does this language indicate a deliberate purpose not to fix a definite time, but it seems that the parties meant to exclude any construction by which D&Z could be held to even a "reasonable" time. "If the contract is silent, a reasonable time is supposed by the law to have been intended. In the present contracts a reasonable time is not to be assumed because they are not silent as to time." Cory v. Logan Coal & Supply Co., 5 Cir., 48 F.2d 28, 30.

Naturally, it was BICOA's "desire" to have the work done as soon as possible. In its argument BICOA fixes November 30, 1956, as the time when the plant should have been completed. However, the obligation was merely to use "every reasonable effort", and I do not think that a promise on the part of a contractor to use every reasonable effort to finish a job when the owner would like to have it finished is breached by a mistake causing delay, it being the fact that the work has been pushed at all times energetically, uninterruptedly and with sufficient personnel, as this job was. Whether D&Z is responsible for delay due to the insufficiency of the oven involves an entirely different obligation and will be dealt with under the issue of damages.

---

4. As a matter of fact, it appears that the actual physical construction of the plant and the installation of equipment was accomplished by Thanksgiving 1956 within the alleged maximum cost. The additional cost consists of engineering services occasioned in an effort to correct various deficiencies in equipment, in improving the process and in attempting to put the plant in operation.

Inasmuch as almost all the defaults charged against D&Z have to do with the equipment (by far the most serious of them centering about the largest piece of equipment in the plant, namely, the oven), D&Z's contract obligations in respect of the equipment must now be examined. The matter of equipment is the subject of a number of different provisions in the contract. I shall not attempt to discuss in detail each of such provisions, but shall merely state general conclusions.

Although all the equipment was to be purchased, I cannot agree with D&Z's interpretation of the contract in respect of it, namely, that, having recommended a suitable kind of mixer, conveyor, oven, or whatever, and having arranged with a vendor for its purchase, all that D&Z had to do was to see to its installation and hookup with other pieces of equipment necessary to produce a continuous operation.

■ D&Z was an engineering firm, holding itself out as experienced in the designing and engineering of industrial plants and as having made a study of the contemplated process. It had contracted to make the necessary engineering studies and recommend the type and character of equipment required. The "executive work order" issued by it on January 14, 1956, construed the "scope of work" as including "complete purchasing services". Certainly, both in recommending and in purchasing equipment, D&Z was bound to exercise reasonable professional engineering skill. Even though the drawings and specifications which it undertook to make were only such as were necessary for obtaining bids, it was bound at the very least to look at the manufacturer's specifications for any major piece of equipment and to see to it that equipment wholly incapable of performing the function required of it would not be purchased.[5]

Coming now to the question of performance, I find that D&Z failed to exercise reasonable engineering skill in connection with the oven in that it recommended and effected the purchase of a piece of equipment wholly incapable of furnishing the necessary heat required by the duty specification.

In this connection, a word about the process may be helpful. The process begins with mixing the iron ore fines with lime in a sort of paste which is formed into blocks which are placed upon a conveyor and automatically moved slowly through the oven. The function of the oven is to dry the blocks before they are exposed to an atmosphere of carbon dioxide which hardens them and completes the process. Duty specifications drawn by D&Z provided that the oven should remove 8,400 pounds of water per hour.

It is true that the problem of drying is complicated by the fact that air circulation as well as heat plays a large part in it, and air circulation usually presents difficulties requiring the skill of experts in that special field. However, there is nothing especially complicated about determining whether or not enough heat is provided, and its answer is one easily within the skill of a competent mechanical engineer. Of course, a number of factors in addition to the amount of heat needed to convert the water in the blocks into vapor have to be considered, such as loss of heat through the walls of the oven and through exhaustion of air from the oven and so forth, but to make a rough calculation covering all these factors would not take more than four or five hours of work. In the present case the problem was even simpler. It is a rule of thumb with engineers that 1,000 b.t.u.'s are required to vaporize one pound of water. It seems to me that any competent engineer giving even the most superficial study to the proposal submitted by Industrial Ovens would have been aware

---

5. Some light is thrown upon its own conception of its duties by the fact that, in the course of the revision of the oven specifications in order to cure deficiencies in the original ones, D&Z, after consultation with the manufacturer and relying on certain drying tests made by it, rejected in an important particular the advice of the independent expert selected by it.

immediately that there was something very wrong with equipment which provided only 6,400,000 b.t.u.'s per hour to meet a duty specification which called for removal of 8,400 pounds of water per hour.

In such state of facts, it is a matter of minor importance that D&Z relied upon a test program conducted by the vendor of the oven which may or may not have been adequate. Whatever studies or tests may have been made, I do not see how it can be argued that reasonable skill was exercised by an engineering firm when it recommended and purchased a piece of heating equipment—the largest and most expensive piece in the plant—which a few hours of study would have shown could not possibly have produced much more than one-third of the heat required to fulfill its own duty specification.[6]

In considering the various matters in respect of which BICOA charges D&Z with faulty performance, there are several points which should be kept in mind:

No one imagines that in starting up any automatic plant of this general nature, regardless of whether it is for a new and untried process or a well known one, there will not be some time lost in getting the "bugs" out. As to several of the items in question, it was not proved that, given more time, D&Z, working with the vendors, would not have made the equipment work properly.

As has been pointed out, when D&Z contracted with BICOA, no plant for the manufacture of blocked iron on a commercial scale by a continuous process had ever been constructed. In such case initial performance is sure to fall short of perfection and "reasonable skill" allows for a wider margin of error than in the case of a plant whose operation is well known and the details of which have all been thoroughly tested by experience.

Both parties take the view that an important consideration in determining whether, or how far, D&Z's performance fell short of the professional skill required of it is whether the recrystallized limestone process required development at the time the contract was entered into. The answer will have to depend very largely on what is meant by the "process".

If that term merely means the formation of a block from a mixture of lime and ore fines, followed by evaporation of the water and the recrystallization of the lime by exposing it to an atmosphere of carbon dioxide, the process was fully developed. However, if the "process" as understood by the parties includes methods and mechanical means of carrying out these steps on a commercial scale, e. g. continuous or batch operation, selection of types of automatic machinery to be used, heat and air controls for drying, etc., then the process was far from being fully developed and needed a great deal of development and experimentation. I think the latter meaning represents the understanding of the parties, that BICOA must have recognized that in designing and constructing a plant to carry out the process there were likely to be miscalculations and errors above and beyond the so-called "bugs" and that the existence of such, if not too serious, would not evidence want of the reasonable engineering skill which it had a right to expect of D&Z.

BICOA argues that little or no weight should be given to the fact that the process was new and untried in commercial manufacturing because D&Z wrote a letter before the contract was made, stating that the process had been studied by it and that it was a feasible one. The word "feasible" is not a very precise term but it can be said with confidence that a report by an engineer that such a process is feasible does not mean that in his opin-

---

6. It may be true as D&Z's brief suggests that a check on the heat capacity would not have answered the problem of the oven and that air circulation is just as important as heat. However, D&Z does not pretend that, with only 6,400,000 b. t. u.'s of heat input, the most perfect system of air circulation known to engineering science could have possibly dried the blocks as the specification required.

ion the only thing left to do is to assemble the equipment and start up operation, without the necessity of any further study or development. It does mean that successful operation is possible, and in the present case that it has been proved by the event.

Defects of equipment not attributable to D&Z's failure to use reasonable skill in recommending it cannot be laid at its door. If equipment failed to work because of vendors' failures in manufacture or even in some detail of specialized design, the consequences of that failure must fall on the vendors rather than on D&Z who in the exercise of its duties to purchase procured for BICOA a guarantee of performance with every major piece of equipment purchased.

■ The contract did not require D&Z to provide the best possible equipment. Equipment installed which performs the job under the conditions of continuous full scale production fully meets all requirements as to the exercise of reasonable skill in recommending and purchasing it.

■ With these guides in mind, I find that, except in the case of the oven, BICOA has failed to establish non-performance by D&Z of its obligations in respect of equipment.

As to the Reiter loading conveyors, BICOA has not proved that these conveyors could not have been made to work, allowing time to adjust them. They were a type that had been observed in successful operation in other plants by both D&Z and BICOA.

As to the sliding doors, these doors were inside of and part of the mechanical equipment of the oven-carbonator combination provided by the vendor. Their imperfect operation was solely the responsibility of the vendor in the detail, design or manufacture of the equipment furnished.

As to the continuous mixers, these mixers, after realignment and the addition of a bearing to one of them, are still in operation, producing blocks. Whether or not a batch mixer would have been better,

D&Z's recommendation of the continuous type was not, under all the circumstances of this case, a failure to exercise reasonable engineering skill.

As to the carbonator roof, this roof was constructed of metal and, after three years, had to be covered. Whether this roof corroded because of poor maintenance is not completely clear, and, in any event, BICOA has failed to prove that the roof was an unsuitable one for D&Z to approve.

As to leakage from the carbonator, by July 15 all substantial leakage was restricted to the doors and some leakage there was unavoidable. All parties were aware of that fact.

As to the cracking of the oven-carbonator floor, the measure of duty is different. D&Z contracted to and did construct the oven floor with its own workmen and it can be held responsible for its failure to stand up under operating conditions.

I will at this time refrain from making any finding concerning the adequacy of the oven revisions. Having found that D&Z failed to perform its contract in recommending the original oven, it seems to me more appropriate to determine the effect of its subsequent conduct when we come to the issue of damages. Whether such subsequent conduct was an additional breach of contract or a negligent prolongation of the damage period, or whether it represented reasonably skillful attempts to mitigate damages, are matters which will be reserved for consideration when determining what damages may be proved.

As to the alleged default on the part of D&Z in respect of the plant's capacity. Of course, the plant has never actually produced 360,000 tons in a year, but the fact, if it be a fact (and I think it has been proved), that the plant is not capable of producing at that rate would not establish a default on D&Z's part, unless the plant capacity should be so far short as to be in itself proof of lack of reasonable skill.

It appears clearly from the testimony that the rate of production is vitally af-

fected by the type of ore used and the estimate of production mentioned in the letter of November 11, 1955, which was incorporated by reference into the contract, was based upon the use of Labrador ore of a specified density. Labrador ore has never been blocked at the plant and I am unable from any evidence before me to determine whether or not the plant could produce more if that ore were used.

There must be a great many things about operating, with specially built equipment, a manufacturing plant of a kind never before operated on a large scale which can be learned only by experience. How much of the plant's improvement in production in later years can be laid to the acquiring of knowhow after commercial production was begun in 1957 is impossible to say.

If the parties, when they made their contract, ever really intended 360,000 tons per year as the "rated" capacity of the plant, they substituted in their subsequent dealings the measure of 1,000 tons per day. This is apparent in a good many places in the testimony and particularly in BICOA's letter of August 2 which described the alleged breach by D&Z as failure of the plant to produce *1,000 tons a day*. In view of the record before me, I cannot say that it has been proved that this plant ultimately failed to have the "rated capacity" mentioned in the contract, as that term was understood and interpreted by the parties. Even if "rated capacity" meant actual capacity, it seems to me that, since the plant has on 17 different days during March-June 1959 actually produced 1,000 tons or more, BICOA would still fail in its assertion of this cause of action.

Turning now to D&Z's claim, it consists of charges for work performed and out-of-pocket costs incurred, plus overhead, for the period October 1, 1956, to August 1, 1957. Part of the account is for engineering work done at D&Z's home office and part for work done at the plant by the field force. There are also charges for amounts paid to vendors, for a balance due on the original fee, for an

additional fee, and for a small sum, the expenses of a works office at the plant site.

There is also a claim for $6,000 based on a reduction made by D&Z in its home office engineering charges for work done earlier than the period in dispute here. Sometime prior to October, 1956, BICOA had protested the amount of these charges as excessive. The allowance was agreed upon and the invoice covering those charges was paid, minus the $6,000 allowance. This matter is closed and D&Z is not entitled to recover the item.

The field engineering charges in dispute amount to $105,579.54. They were invoiced to BICOA monthly during the period mentioned, but the invoices were ignored. The home office engineering charges were accrued on the books of D&Z but not billed until some two months after D&Z left the job. They amount to $53,128.42. As to both categories of engineering charges, BICOA resists payment on several grounds.

First, it contends that the whole amount is in excess of $1,165,000 which it claims was the guaranteed maximum cost. This is based on an incorrect view of the contract as has been pointed out.

Second, BICOA contends that the charges, in the main, were incurred in an effort to correct what was admittedly a deficiency in the oven. In effect, it is pleading discharge by breach. However, liability to pay according to the provisions of a contract for work actually done by a contractor with the knowledge and consent of the owner and of which the owner has received the benefit is not extinguished by the fact that the owner has an unliquidated claim for damages based upon defective performance, at an earlier date, of some part of the work. See Williston, Contracts, Section 887F and note that there is no repudiation of the contract now before this Court, as there was in De Forest Radio Telephone & Telegraph Co. v. Triangle Radio Co., 243 N.Y. 283, 153 N.E. 75 cited by Williston, no refusal to perform, no total failure

of performance but simply deficient or negligent performance of a part.

That the parties adopted this view of the obligation to pay the monthly invoices after December, 1956, can be plainly seen from a letter of February 28, 1957, written by D&Z and "approved and agreed to" by BICOA. This letter, written after a conference relating to payment of the cost of the oven revision and new parts, reads "We are continuing to perform under this contract between us and you are agreeing to continue to make payments under this contract * * *." It is true that the letter provides "your payments * * * are without prejudice to any interpretation that either of us might place on the language of the contract". However, the letter is an explicit and unconditional agreement to pay money "under this contract", that is, on monthly invoices, and whatever the parties had in mind about the "without prejudice" clause, the letter cannot be read "We agree to pay you monthly for your work, but if our interpretation of the contract is that, for one reason or another, we think we do not have to, then we will not pay you".[7]

■ As to the home office charges, there is an additional defense based on a letter of October 17, 1956, written by D&Z in the course of the dispute about the amount of engineering charges mentioned above. The letter states, "We are willing, therefore, to allow a credit of $6,000 on charges already presented and to terminate our home office engineering as of October 1, 1956." The difficulty with this defense is that the letter in question was merely an offer which was rejected by BICOA, and the settlement of the disputed amount of charges was effected by a second letter written on November 6, 1956, which did not contain any statement that home office engineer-ing would be terminated. I, therefore, find that there was no binding agreement on the part of D&Z to furnish home office engineering services without charge.

Even if it could be held that the offer to "terminate our home office engineering" somehow survived the flat rejection of it by BICOA, it is clear from the situation existing at the time it was written that it was intended to refer only to home office engineering charges from October 1 to the completion of the plant, which the parties knew was close at hand and which actually took place in the latter part of November. When the letter of October 17 was written, neither party expected that D&Z would be doing much more work except field inspection and start-up operations and the letter expressly stated that D&Z would make a charge for those services. It was not until after the plant had been completely erected and put into operation and it had been discovered that the oven was wholly inadequate that D&Z began anew to perform this type of engineering services and then only upon the request of BICOA's president who found himself unable to get the manufacturer of the oven to remedy its deficiencies. The "home office" engineering charges now claimed by D&Z, with the exception of some $1,163.77, were all incurred after D&Z had been expressly requested to resume its engineering work.

■ Under the principle of law stated in an earlier place in this discussion,[8] particularly when taken in connection with the promise to pay contained in the letter of February 28, 1957, it is clear that BICOA had no right to withhold monthly payments for the field engineering work done by D&Z from December 1956. It could have terminated the contract at any time it desired, but, if it

---

7. Of course, it is possible that the result will be the same if it turns out that the damages on the counterclaim exceed the amount due on these various charges.

8. Liability to pay according to the provisions of a contract for work actually done by a contractor with the knowledge and consent of the owner and of which the owner has received the benefit is not extinguished by the fact that the owner has an unliquidated claim for damages based upon defective performance of some part of the work.

elected to continue with D&Z, it was bound to pay for the work done by the latter. This being so, D&Z, having done seven months' work without being paid for it, was fully justified and within its legal rights in quitting the job on July 31, 1957. Even if the contract could be construed as an agreement to produce a plant with a guaranteed capacity of 360,000 tons a year, D&Z's quitting the job when it did could not be assigned as a default on its part.

The contract contains the following clause relating to D&Z's compensation for services:

> "If before completion of this plant you instruct us to increase the facilities to produce more than 250,000 long tons annually, the fee above named will be increased by 4% of the additional cost resulting from such increase in capacity."

Basing its claim upon the increased rated capacity of the plant, D&Z now claims an additional fee of $10,000.

The original contract contained an estimate of $974,000 for the 250,000 ton plant. After the change increasing the capacity of the plant was made, D&Z submitted at least two estimates of the total cost of the work. The one submitted on May 1 contained a list denominated "Change of Scope Items" totalling $127,650. A later estimate submitted on July 26 with an accompanying letter stating that these estimates were based on completed drawings and bids contained an item for "Changes increasing the scope of the work", totalling $36,200. The record does not contain any other evidence that will enable me to compute the actual increase in cost due to the increase in capacity as distinguished from increases of prices or of estimates that were originally too low, etc. It seems to me that unquestionably there was an increase of cost due to the increase in the size of the plant and that the estimated items referred to as changes in the scope of the work conservatively reflect that increase in cost. I, therefore, find that D&Z is entitled to recover an additional fee of 4% of $163,850 or $6,554.00.

I find that in addition to the items already discussed D&Z is entitled to recover from BICOA the following:

Amounts actually paid to vendors in connection with purchase of equipment ........ $11,417.46

Charges accrued for work performed at D&Z's office which would normally be included within Article III (4) ........................ 1,843.84

Amount due on original fee of $37,500.00 ............. 5,889.75

REQUESTS

The parties have presented a very large number (D&Z 118, BICOA 41) of requests for findings of fact and conclusions of law. These requests have been helpful, but I believe that I have in the foregoing opinion stated all the facts and conclusions of law essential to a decision of the issues before the Court and such statements answer a great many of the requests. Other requests are for purely evidentiary facts. I have carefully considered them in my findings upon the ultimate facts and, therefore, do not answer them specifically. A large number of the requests have to do with the interpretation of the contract and the scope and nature of D&Z's obligations under it. These matters, I believe, have been very fully covered in the opinion and the Court's view of them has been stated. All requests of this nature are denied so far as they are in conflict with the opinion. Failure to answer any request is not to be taken as a tacit affirmance of it.

I believe that the parties are entitled to specific answers to the following requests which may not have been fully covered in the opinion.

### D&Z's Requests

#### (1) Findings of Fact

14. The last two sentences are affirmed.

16. The facts stated are correct but, if D&Z chose to draft a million dollar contract without legal advice, that fact,

furnishes no reason for suspending the ordinary rules of contract interpretation.

17. Affirmed.

19. The facts stated are correct. However, the inference is not to be drawn that BICOA did not rely upon D&Z's professional engineering skill and recommendations in the final decisions relating to purchase of equipment, specifically the oven.

25. Affirmed.

38. Affirmed.

43. Affirmed.

51. Affirmed, but see opinion as to exercise of reasonable skill in performing the work.

52. Affirmed.

55. Affirmed.

56. Affirmed with the qualification that "were competent" means "had sufficient experience".

57. Affirmed.

62. The process now used at BICOA's plant differs in some particulars from that given initially to D&Z.

67. Affirmed.

78. Affirmed.

80 to 99, inclusive. These requests relate to alleged deficiencies in various matters other than the oven. I believe they have been adequately dealt with in the opinion.

102 to 109, inclusive. While these requests have some bearing upon the issue of liability, answers to them are not essential to that issue. They have a much more direct bearing upon the question of damages which, as has been stated, is reserved. For that reason they are not answered.

### BICOA's Requests

#### (1) Findings of Fact

9. Affirmed.

10. Affirmed.

12. Affirmed to the extent that D&Z knew that the drying problem was critical and that its solution was essential.

16. Denied. The information given by D&Z's representative to Industrial Ovens in the very early stages of negotiations was no more than a statement of what sort of oven it wanted and, perhaps, a suggestion of what might do the job. It was intended that Industrial Ovens should do its own "designing" and no one thought that the suggestions of D&Z were limitations on Industrial Ovens.

#### (2) Requests for Conclusions of Law

Each of the parties has submitted requests for conclusions of law. I think that every one of such requests has been fully answered by the discussion of the interpretation of the contract and the principles of law involved in the foregoing opinion. It seems to me that it would be a mere duplication and possibly a source of confusion for me to proceed to answer these requests specifically. I feel that in order to answer them properly so much modification and explanation of their language would be required in order to make them wholly consistent with my view expressed in the opinion that the result would be of little assistance and probably tend to becloud the issues.

### Appendix.

December 12, 1955

Mr. Louis G. Imperato, President
Blocked Iron Corporation of America
Philadelphia, Pa.

We hereby propose to design and construct a plant for the manufacture of blocked iron, using iron ore fines from a stockpile and employing the blocked iron recrystalized limestone process, at the ore docks of The Pennsylvania Railroad, Philadelphia, Pa., with a rated capacity of 250,000 long tons per year, estimated to cost $974,300 as set forth in letter dated November 11, 1955 addressed to Leonard J. Buck, Inc. We will prepare complete working drawings and specifications necessary for obtaining bids for the purchase of all equipment and materials and for obtaining sub-contract bids if required, and for executing the complete construction of the plant, ready for putting into operation for normal

production of blocked iron as above described;

and to render such other technical, engineering and construction services as may be necessary in carrying out this project.

## I. SERVICE TO BE RENDERED

1. We shall be guided in all respects by such instructions as you may, from time to time, give us.

2. We will make the necessary engineering studies and determinations, recommend to you the type and character of equipment and of construction required, and prepare plans and specifications for such equipment, material, and construction work.

3. With our own forces we will execute the construction work and install the equipment to the extent required by you, subletting parts of the work with your approval when it is to your advantage to do so, and turn the completed work over to you.

4. We will furnish at our own expense:

(a) The services of the Executive Officers of the Company, who will direct and oversee the work performed under this agreement.

(b) The services of the Construction Department in our Home Office.

(c) The services of the Purchasing Department in our Home Office, which will assist in the purchase of the equipment, apparatus, and materials.

(d) The services of the Accounting and Auditing Departments in our Home Office.

(e) The services of our Insurance Department in our Home Office.

## II. COMPENSATION

1. You are to pay us for the work and services specified in Section I a fixed fee of $37,500.

If before completion of this plant you instruct us to increase the facilities to produce more than 250,000 long tons annually the fee above named will be increased by 4% of the additional cost resulting from such increase in capacity.

2. ~~As promptly as possible after your acceptance of this proposal, we will agree with you upon the scope of the work, the estimated cost of the work, and services to be performed by us hereunder (exclusive of the work and services specified in Section I, to be furnished at our expense). With this as a fee base, the amount of the fixed fee shall be adjusted on the basis as above set forth.~~

3. Unless otherwise specified in paragraph 1 above, the fixed fee is payable on the fifteenth of each month in such proportion of the total fee above established as the total amount of actual expenditures and of amounts payable on material delivered or services rendered as of the last day of the preceding month, bears to the total official estimated cost of the work, less ten per cent, and less payments previously made on account of said fixed fee. The balance of the fee shall be paid thirty (30) days after completion and acceptance of the work.

4. It is understood that the estimated cost is to be agreed upon for the sole purpose of determining our fixed fee, and that it will in no way affect our right to be reimbursed for actual costs, as provided in Section III. With this in mind, it is agreed that the following items of cost shall be excluded in arriving at the estimated cost:

(a) Payments to labor at a rate in excess of the straight time rate for work performed in excess of 40 hours per week for first shift operations and in excess of $37\frac{1}{2}$ hours per week for second and third shift operations; premium payments to labor for work performed on Sundays, holidays, and the sixth and seventh days of work-week, and any other premium payments made to labor; expense allowances of any nature offered to and paid labor of any class, except professional employees engaged in design, inspection or supervisory activities for us.

(b) The amount of any contributions required by law and/or taxes based on the salaries or wages of our employees.

## III.  COST OF THE WORK

Within 15 days after receipt by you of the statement specified in paragraph 2, Section IV, you will reimburse us for actual costs incurred by us, as follows:

1.  The cost of all labor, material, equipment, and subcontracts for labor or materials or both, you to be credited with all discounts of whatever nature.

2.  The cost of tools and construction equipment purchased, and the rental of any equipment furnished or hired.

3.  The cost to us (payroll, plus 100% to cover our primary overhead) of the services of our regular salaried employees in the Engineering and Drafting Departments in our Home Office in connection with the engineering and designing which we may be called on to do, the specification of materials and apparatus, and the inspection of the work.

4.  The cost of a works office, including the salaries and expenses of a superintendent of construction, an accountant, a purchasing agent, and such assistants as they may require; the cost of all field engineers, inspectors and expeditors; the expense of maintaining the works office.

5.  The cost of insurance, and any expense or obligation, whether covered by insurance or not, incurred in connection with any accident or damage to person or property, provided that the same is not incurred as a result of our failure to carry the insurance required by Section VI hereof.

6.  Any traveling expenses or expenses of a similar character necessary to expedite the work, or fabrication of materials, or to insure the quality of the work.

7.  The amount of any contributions required by law and taxes based on the salaries or wages of employees performing the labor mentioned in Paragraph 1, and of those mentioned in Paragraphs 3 and 4 of this Section III.

7A.  The amount of any taxes based on the gross income City of Philadelphia Mercantile License Tax and Philadelphia School District General Business Tax to the extent that we may be required by law to pay such taxes except such taxes as would be applied to the fee.

10.  Other expenditures made by us which are necessary to the performance of the contract.

It is understood that the following shall not constitute reimbursable items of cost hereunder:

a.  Overhead charges excepting those provided for in Paragraphs 3 and 4 of this Section III.

b.  Those items set out in Section I as being furnished at our expense.

c.  Any taxes, state or federal, based upon our income or profits.

## IV.  ADVANCES AND DISBURSEMENTS

1.  You will advance us funds, from time to time, from which we will make all payments for material, labor, equipment, services, etc.  The manner in which such advances shall be made, the amounts thereof, and any safeguards to be employed in connection thereto will be determined or approved by you.

2.  We will give you each month a detailed statement of expenditures during the previous month, supported by proper vouchers, and such other reasonable reports and estimates as you may require.  The amounts of all advances made by you to us shall be credited against the sums payable by you to us pursuant to this contract.  No part of the funds advanced shall be used in payment of our fixed fee.

3.  All contracts and orders placed by us, payrolls and other obligations, shall be in your name signed by us as agents for you.

## V.  APPROVALS — ADMINISTRATION OF CONTRACT

1.  Any and all action to be taken by us pursuant to this contract, including the incurring of obligations and the ex-

penditures of funds, shall be subject to such approval as you may require.

2. You may purchase directly such materials and equipment as you desire, but the exercise of this right shall not operate to reduce the amount of the fixed fee payable to us.

3. It is not feasible to include in the contract all of the detailed provisions as to its administration; therefore the procedures to be followed in administering the contract shall be mutually agreed upon from time to time.

## VI. INSURANCE

1. We will place insurance as follows:

(a) Workmen's Compensation and Employer's Liability Insurance

(b) Contractor's Public Liability and Property Damage Insurance

(c) Contractor's Protective Public Liability and Property Damage Insurance

(d) Automobile Liability and Property Damage Insurance

(e) Fire and transportation insurance, covering tools and equipment used in or incident to the work, owned or hired by us, or for which we may be responsible.

2. The limits of liability provided in each Liability Insurance Policy shall be $500,000. for injury, including accidental death to any one person, and, subject to the same limit for each person, $1,000,-000 for any one accident involving two or more persons.

3. The Automobile Property Damage limit shall be $500,000. each accident. Other property damage shall carry the same limit per accident but shall be subject to an aggregate limit of $100,000 during the policy year.

4. We will place such additional insurance coverages against other risks involved in the prosecution of the work under this agreement as you may direct.

5. All-Risk Installation Insurance covering materials against direct damage in transit, during erection, and until final acceptance.

## VII. PROGRESS REPORTS

1. We will render reports to you monthly, showing the progress of the work in its various parts, and any changes that it may seem advisable to make in the estimates of cost or time required for completion.

## VIII. AUDIT

1. Our correspondence, records, vouchers, and books of account, insofar as work done or money expended under this agreement are concerned, will be open to your inspection and audit, and we will deliver to you such of these (or certified copies thereof) as are required for your permanent files.

## IX. CHANGES

1. You may at any time make changes in the scope of the work hereunder, and if such changes are material, the amount of the estimated cost and the fixed fee shall be adjusted accordingly, in accordance with Paragraphs 1 and 2 in Section II.

2. The phrase "material changes" shall be interpreted to represent a total amount in excess of ~~five~~ per cent ~~(5%)~~ of ten        10% the estimated cost of the work.

## X. TITLE TO PROPERTY

1. The title to all property purchased by us for which we are entitled to be reimbursed shall vest in you upon its delivery to us.

2. All studies, designs, drawings, plans, specifications, etc., prepared by us shall be your property and shall be delivered to you, and you shall have the right to use the same for any purpose whatever, without right on our part to additional compensation therefor.

## XI. CONTRACT PERIOD

1. It is recognized that the period of time over which this contract is to be performed is uncertain as of this date. However, we will use every reasonable effort to have the work hereunder completed at the time you desire.

2. You shall have the right to occupy the buildings and install manufacturing

machinery progressively as parts of the work are completed, or partially completed, but this shall be done with a minimum disturbance of our work hereunder.

## XII. COMPLIANCE WITH LAW

1. We will use due diligence to ascertain all Federal, State, and local laws, rules, regulations and ordinances applicable at the time and during the course of the work, and shall make all reasonable effort to conform to the same.

2. We will promptly notify you in writing of any claims of alleged violations of such laws, rules, regulations or ordinances, and will take the necessary legal steps to defend against such claims. The defense of such actions shall be subject to such control as you may wish to exercise. Except where we have failed to exercise such due diligence or to make such reasonable effort required of us, the cost of defending such actions and the amount of any penalty, judgment or assessment entered or assessed in any civil proceeding shall be reimbursed as part of the cost of the work, but shall not be considered part of the fee base. We will require such undertakings from all subcontractors in connection with their compliance with applicable laws, regulations, rules and ordinances, as you may request.

## XIII. PERMITS AND LICENSES

1. We shall procure all necessary permits and licenses.

## XIV. ASSIGNMENT

1. Neither this contract nor the proceeds thereof shall be assigned by us without your written consent.

## XV. TERMINATION OF EMPLOYMENT

1. If at any time you should wish for any reason to discontinue the work, you are at liberty after ten days' notice in writing to terminate our employment and to take possession of the work done and material purchased for you under the terms hereof.

2. In case you take such action, we shall be entitled to receive in payment for our services the specified percentage on the total sum of actual expenditures, accounts due and payable, outstanding obligations, and uncompleted contracts and orders as of the date of such termination.

## XVI. INTENT

1. Subject to the provisions of this agreement and without limitation thereof it is the general intention of the parties that we shall be reimbursed for all expenditures made and obligations incurred by us which are pertinent to the performance of the work and services required of us hereunder, and that the amount of the fixed fee shall represent the total compensation payable to us.

## XVII. ACCEPTANCE AND APPROVAL

1. Upon acceptance of this proposal by you it will constitute an agreement between us.

DAY & ZIMMERMANN, Inc.